South Dakota, Flandreau Santee Sioux Tribe v. James Terwilliger, et al. Very well. Ms. LaFrance, we'll hear from you first. Thank you. May it please the Court, and I would like to reserve three minutes for rebuttal. You may, but you'll have to stop on your own because the clock will continue if you proceed past three minutes. Thank you, Your Honor. The District Court erred when it determined that the contractor's excise tax assessed on a non-Indian contractor was preempted under IGRA and under the Indian Trader Statutes. The District Court found that the Indian Trader Statutes established sufficient federal regulation to expressly preempt the contractor's excise tax. This is an erroneous conclusion as case law does not support such a position. The U.S. Supreme Court in Milhelmettea stated that since Warren Trading, the Court's opinions have undermined the proposition that no state regulation of Indian traders can be valid. Therefore, in any case where they may be implicated, the BRAC or balancing analysis is required. Using the BRAC or balancing analysis, the Indian Trader Statutes do not preempt the tax. First, it must be determined that the regulation is exclusive or comprehensive. Initially, it is impossible to comply with these statutes, primarily because the BIA does not issue Indian trader licenses in this area. Therefore, it is illogical to claim that these statutes can be considered exclusive or comprehensive in any area, let alone the area of renovation and construction. Utilizing the BRAC or balancing test also does not preempt the contractor's excise tax under IGRA. As this Court is aware, the BRAC or balancing test requires an inquiry into, first, the extent of federal regulation of a tax activity, second, the balancing of tribal and state interests, and third, a nexus between the tax collected and the services provided. State jurisdiction can only be preempted by the operation of federal law if it interferes or is incompatible with federal and tribal interests that are reflected in federal law. First and foremost, IGRA does not provide a comprehensive and pervasive federal regulation scheme of casino construction. There is literally one sentence in IGRA that mentions construction. As stated in the statute, IGRA's core objective is to regulate how Indian casinos function so as to assure that the game is conducted fairly and honestly by both the operator and players. In Yee, the Court found that extending IGRA to preempt any commercial activity remotely related to Indian gaming stretches the statute beyond its stated purpose. Additionally, this Court found in Harrah's that contracts tangentially related to tribal gaming are not necessarily subject to IGRA. Yet that is precisely what the District Court has determined in this case. The District Court placed undue weight on the fact that the State did not provide for any inspections of the project or the premises. First, IGRA only requires the NIGC to approve a tribal ordinance or resolution regarding the construction or maintenance of a gaming facility. There is no requirement for inspections. There is no standard of quality that must be met regarding construction. Second, if any inspections that were conducted on this project were at the discretion of the tribe. While it's admirable that the tribe has set up a process by which projects are inspected by the IHS or other federal or tribal entities, there is no federal statute that requires such oversight. Testimony at trial determined that any modifications or changes that might be made due to any deficiencies found during an inspection would be completely voluntary with no negative consequences should no action be taken. This is completely contrary to the facts both in Bracker and Rama. In Bracker, there was extensive regulation of on-reservation timber. It included clear cutting restrictions, detailed guidelines for the sale of timber, regulation of timber advertising, fire protection measures, a requirement that all contracts and timber cutting permits be approved by the Secretary and a board for administrative appeals. In Rama, the BIA was required to conduct a preliminary site inspection for the school, prepare cost estimates, and retain records for the Secretary of the Interior's inspection. The BIA also had the authority to monitor and review subcontracting agreements. Because of this level of oversight, the court in Rama determined that the level of federal supervision leaves no room for additional burdens by the state. Nothing even remotely similar is at play in this case. Outside of the approval of the ordinance or resolution regarding the construction of the gaming facility, there is no required federal involvement. Any such involvement referenced by the tribe is completely voluntary. Any such voluntary conduct cannot constitute comprehensive and pervasive federal regulation. Nor has the state abdicated its obligations to the on-reservation activity. The state continues to regulate construction activity. Neither the contractor, architect, or any identified subcontractor works solely on the reservation and not otherwise within the state of South Dakota. The contractor is licensed to do business in the state of South Dakota and therefore complies with its state standards, whether on or off the reservation. This includes paying the contractor's excise tax. There is no federal regulatory agency that regulates construction activity. The court also errs when it determines that the harm to the state is minimal while the burden to the tribe is great. The amount of the tax is $384,436, 2% of the approximately $19 million project. The district court conflates this number with a hypothetical number of $1.2 million, which is based on the speculation of the tribe's witness as to what purchasing $384,000 of slot machines would bring in. The state has... Counsel, you call that speculation, but the district court heard some pretty detailed testimony about how that money would have been spent and what the result of those purchases, I think of the additional slot machines, would have resulted in in terms of additional revenue. So why is that speculation? There's no actual evidence that it would bring in that amount of money. That same witness also testified to the fact that another casino within the same area had at one time wanted to put in an extra... It started at, I think it was 800 slot machines and is now down to 700. The assumption is that there is no, what I would say, the law of diminishing returns. Just because you add those doesn't mean you're actually going to get that amount back. The state would contend that the court placed undue weight on that because it is speculative in nature. Did the state put on any evidence to directly counter it other than cross-examination? No, the state didn't have any independent witness testimony, only the cross-examination. The state has a legitimate right to tax. That is true even if the tribe's revenue is reduced. As Justice Rehnquist stated in Colville, economic burdens on the competing sovereign do not alter the concurrent nature of the taxing authority. Contrary to the district court's assertion, this tax is not overwhelmingly burdensome. It is a 2% tax on the contractor's gross receipts. This was payable as payments were made on the project over a three-year period. As this court acknowledged in its prior decision regarding the summary judgment, this is only a small percentage of the casino revenue. The casino's net revenue over the same three-year period was over $20 million. Further, this amount was built into the projected cost of the project. It was anticipated through the securing of the financing and will likely be passed on to the casino patrons. Ultimately, the district court determined that the amount of tax is minimal compared to the state budget. This, however, is an argument that any taxpayer could make. Raising revenue to provide governmental services is a legitimate state interest. The contractor's excise tax is deposited into the general fund, which is then used to fund various services that benefit the tribe, tribal members, and the contractor. In Ledyard, the court determined that for a generally applicable tax, a court may credit the service provided by the state to the tribe more generally as related to the tax. The tribe testified to various services provided by the tribe to tribal members that are similar to those provided by the state. For example, social services. While the tribe has chosen to offer these benefits, it does not mean that those services are no longer available to the tribal members that the state provides or that the value of the state service is lessened. These services remain available to the tribal members. The tax also does not impede tribal sovereignty. This is a tax on the non-Indian contractor. It is a one-time tax tied to a construction project. This tax does not impair the tribe's ability to regulate gaming. IGRA's purpose is to promote tribal economic development, self-sufficiency, and strong tribal government. Nothing about this tax prevents the tribe from remaining the primary beneficiary of the gaming operation. While the state provided governmental services using dollars received from the tax for the contractor and his employees generally, the tribe does not. The legal incidence of the tax is on the contractor, and the state is the entity that provides the governmental services for these tax dollars. The state also provides these services to the tribe and tribal members. The imposition of the generally applicable tax on the non-Indian contractor is valid. It is not preempted by the Indian trader statutes either expressly or utilizing BRCA, nor is it preempted by IGRA. Therefore, the district court's decision should be reversed. I say that the clock stopped, but I think I'm at about my time. Yes, it appears you have about 3 minutes and 12 seconds remaining for rebuttal. Would you like to reserve that? Yes, please. Thank you. Very well, you may. Thank you for your argument. Ms. Kidder, we'll hear from you. May it please the court. My name is Rebecca Kidder, and I, along with co-counsel, represent the Appalachian, in this case, the Flandreau-Santee Sioux tribe. In Hayter, this court already determined that the economic incidence of this tax falls on the tribe. It's not passed on to patrons of the casino. It falls on the tribe. While the legal incidence falls on the tribe's contractor, On remand, the trial court below found that under South Dakota law 10-46A-3, this excise tax is a gross receipts tax that applies to the total contract price paid by the tribe to this contractor, including labor and materials, both. It includes both. After a six-day trial, including the direct testimony of 24 witnesses, 208 exhibits, of which over 190 were submitted by the tribe to show the tribal and federal interest, the trial court ruled finding both express preemption under the Indian trader statutes and implied preemption under the BRCA balancing test as it relates to the Indian trader statutes and the Indian Gaming Regulatory Act in a 121-page opinion. The Supreme Court has explained that statutes passed for the benefit of tribes are about governing the relationship between the United States and the tribe, and there isn't a rule for the state unless those statutes create that rule. That's the Supreme Court's decisions in Rama and BRCA. The analysis with explicit preemption is a little different than implied preemption, so I'd like to talk about explicit or express preemption under the Indian trader statutes first and then talk about the BRCA balancing test. When we talk about express preemption, of course, the courts look at not just the words in the statute but the overall statutory scheme and the context and core objectives of the statute. 25 U.S.C. 261 authorizes the Commissioner of Indian Affairs to have the sole power and authority to regulate trade. 262 defines the persons permitted to trade with Indians using the term trade, not goods. 263 states that all trade with Indians on a reservation is permitted only under the rules and regulations that the Commissioner of Indian Affairs may prescribe. 25 CFR 140.5 subpart 6 defines trade. It says that it means buying, selling, bartering, renting, leasing permitted, and transactions involving property or services. In addition, 140.57 defines commercial trading, meaning engaging in the business of buying and selling. The Supreme Court first addressed the scope of trader statutes in the Indian Commerce Clause back in 1832 in Worcester v. Georgia. In 1959 in Williams v. Lee, the Supreme Court addressed it again, indicating when the Congress has wished states to exercise power, it has granted them that jurisdiction. In Warren Trading in 1963 and Central Machinery in 1980, the Supreme Court explicitly found that the Indian trader statutes do explicitly prevent gross receipts taxes on contractors who are contracting with a tribe. That's the ruling of the United States Supreme Court. Central Machinery explicitly addressed the idea that if the Bureau did not issue an Indian trader license, that somehow the statute is defunct. And the Supreme Court said, until Congress repeals or amends the Indian trader statute, we must give them a sweep as broad as their language and interpret them in the light of the intent of Congress that enacted them. The Indian trader statute... But that case did undeniably deal with just goods, right? That was a sale of machinery or something, I think, wasn't it? It was farm machinery sold, but it was a gross receipts tax that applied to services as well as materials, just like the tax in this case. The other thing is in Mill Hilletia in 1994, the Supreme Court opinion at page 74 through 75, 512 U.S. 7475, that court said that a tax imposed on an Indian trader for trading with Indians is invalid. They upheld that rulings of Warren and Central Machinery. I think it's really important in this case to realize that the evidence of trial demonstrated that the state imposes this gross receipts tax not just on the value of the labor of the contractor, but also on the materials. There were over $900,000 of materials that were subject to this tax that were installed on this casino. The state also, I believe, is really in contradiction to what the Supreme Court recently said in 2020 in McGirt v. Oklahoma. The Supreme Court explained a court may not favor contemporaneous or later practices instead of the laws that Congress passed. We are looking at the intent of Congress, which was to preempt any burden on trading with tribes, and those statutes are still good today, and they do preempt this activity. Counsel, what does the record show with respect to where this tax money goes, what it's used for, what the purposes of the tax are from the state standpoint? When we look at the purposes of the tax, there was uncontroverted evidence that it goes directly into the general fund of the state. None of it is set aside specifically for this project or regulation of construction. The evidence of trial was actually the state doesn't issue contractors licenses to do construction. They don't regulate that in any way, shape, or form. The uncontroverted evidence with the testimony of Dave Derry as well as the exhibits that the judge examined indicated that the state engineering office doesn't issue permits on this contract, and none of the contractors' excise tax they collect funds anything related to regulation of construction on reservations. It goes straight to the general fund. Second question, as I understand it, the tax is assessed against the contractor? Yes, Your Honor. The legal incidence is on the contractor. The economic incidence is on the tribe. Dave Derry, Henry Carlson's owner, gave explicit testimony that's the standard in the industry. And certainly under the Bracker test, the court does look at the economic incidence falling on the tribe. So you say the evidence is the standard in the industry, the contractor passes it along? Yes, Your Honor. All right. Thank you. Turning to Bracker preemption, Your Honors, I'd like to take a look at the three factors and focus specifically on what the state brought up. The state attempts to characterize to this court that the extent of federal regulation and control is minor. The record below does not support that assertion by the state on appeal. I referenced Kaplan v. Mayo Clinic. What's the comprehensive regulatory scheme of casino construction in federal law? So the regulatory scheme on construction is set forth at 25 U.S.C. 2710B2E, D2A, as well as 25 U.S.C. 2713A and B, and then the regulations that flow from them, specifically 559.4, 559.6, 559.3. AGRA, in this case, explicitly requires, in order to gain, you have to have a facility gaming license. In order to get one approved by the National Indian Gaming Commission, you have to certify that that casino is constructed and maintained in a manner that protects the public health and safety. In addition, 25 CFR 559.4 states, this means that a tribe has identified and enforces laws, resolutions, codes, policies, standards, or procedures applicable to each gaming place, facility, or location that protect the environment and public health and safety. Under 559.6, the National Indian Gaming Commission has the authority to require a tribe to submit to the NIGC applicable and available environmental and public health and safety documentation requested. That's the regulation. It has the authority to review the conditions of construction and the condition of the facility. That is identical to what you see in the regulations under the Indian Self-Determination and Education Assistance Act. Most importantly, your honors, 559.3-6 and 25 U.S.C. 2713B give the NIGC the ultimate power. If this facility does not and is not constructed in a manner that protects public health and safety, they have the authority to both issue fines and shut that facility down to end gaming. And that is the ultimate form of control. We also think, your honors, that it's really important to understand the state had the ability to compact for state standards of construction through the state architect to apply here, but they didn't. 25 U.S.C. 2710D3C6 specifically says standards for the maintenance of gaming facilities may be compacted. The 2016 compact between the tribe and the state here is silent because the state did not apply any standards. So that is comprehensive regulation and control. IDLA, by design, played a role or placed a role with the Tribal Gaming Commission and the tribe setting the standards, the policies, the codes, the specifications. They are the authority having jurisdiction, and there were thousands of pages of specifications issued by the tribe here or approved by the tribe in the contract. There were three levels of inspection, both by the architect engineer, an independent inspector, and the Indian Health Service. All of those were inspecting this casino. Mind you, those are all either paid for by the tribe or they're a federal inspection. It is not voluntary for the tribe to build a nice casino. If they don't build it in a manner that protects public health and safety, that casino gets shut down. I want to spend a little time talking about how strong the tribal interest is and federal interest is in this casino in another way. This renovation had to happen to expand this gaming floor. If the tribe didn't expand the gaming floor, it couldn't add machines. The undisputed testimony is that the tribe had lost a lot of its share in the gaming market to another casino that was bigger down the road, Larchwood. It negotiated hard with the state to increase the number of machines it could actually have in its gaming facility, but they couldn't put them in without expanding the gaming floor. They had to do this renovation for that reason. In addition, they had to do the renovation because their HVAC system and fire suppression was inadequate. In order to continue to meet that standard, they had to do the renovation. I think the other things that are important on the regulation is exactly this testimony that the tribe would have purchased those 19 to 20 gaming machines to put on that expanded gaming floor. The state, even in cross-examination, did not have or put anything in the record that indicates this was speculation. These are two witnesses, just like in Anderson v. Bessemer, whose testimony was credible. There was a credibility testimony, and there was not any contradictory evidence, either through cross-examination or by the state putting on any evidence. Has the Supreme Court ever said that you can use this sort of multiplier effect to inflate the effect of a tax on a tribe? It seems to me a tribe could always say, well, if we had more money, if we didn't have to pay taxes, we could invest it in something else, and that's going to be worth more than just the tax amount. But I'm wondering if that's really an appropriate analytical approach. Is there any precedent for that? Your Honor, I think when you look at what they would have used the money for had it not been used here, that is material and relevant, because that goes to the strength of the tribe's interest. In Hayter, this court invited on remand to look at how does this impact the gaining revenue, because that ultimately is the question. That was the intent of IGRA, is to ensure gaining revenue expands and becomes enough for tribes to be self-sufficient. And so we do think it's material how it impacted the revenue, particularly with the invitation of the Hayter panel to look at how does it impact gaining revenue. Well, I don't know what you mean by the invitation of the Hayter panel. Are you talking about something in Judge Loken's single-judge opinion? Your Honor, we're talking about the portion of the opinion that talks about does it have an impact on gaining revenue. And so that's what I was looking at when I talked about that. I think it was at page 945 specifically. Okay. And with a little bit of time I have left, I do want to note that the state does not actually provide any service to the casino, the contractor, or this project. That is the testimony at trial. All they did was talk about services generally available, and certainly under Cabazon v. Wilson, Cabazon v. California, when we are talking about an on-reservation value, the construction of a gaming facility, that is a very strong tribal interest that cannot be overcome by a general interest in raising revenue. There is no evidence on the record that this tax in any way has any nexus to any service provided by the state. Every witness of the state indicated there's no office on the reservation and there's no evidence they provide anything on this reservation. With that, we would stand on the record, Your Honors, below and our briefs, and we thank you for your time. Very well. Thank you for your argument. We do have some time remaining for rebuttal. Ms. LaFrance, you may proceed. Thank you, Your Honor. I just have to touch on a couple of points made by opposing counsel. Regarding the express preemption under the Indian Trader Statutes, as I stated earlier in Milhau Matia, the court did state that anything that implicates, any case that implicates the Indian Trader Statutes should be decided using the BRAC or analysis. As the opposing counsel stated, if we look at congressional intent, congressional intent regarding the Indian Trader Statutes is to prevent, I would say scams, or white persons trying to scam the Indian nation. And that was 200 years ago. In this case, you have very sophisticated negotiators. They were attorneys. The tribe was able to negotiate the contract. There was not, they had more than one bid for this project. There was no intent to defraud the Indian nation. If the court decides that express preemption is, does preempt this tax, then you're basically stating that BRAC and its progeny are irrelevant. Moving on to the $384,000 and what it would have been used for. First of all, this is a tax on the contractor that is then passed on. So it is a line item that is on the estimate that's provided. It is also used to receive the financing. So the reason that the tribe currently has this $384,000 is because they have borrowed this money. And now they are required to use it for casino purposes. If they were not required to pay this tax, they wouldn't have borrowed this money. So to say that we are preventing them from doing anything is not the case. The purpose of the tax, yes, the state did provide evidence that the tax does go into the general fund and it's used for various services. It's used for various, for instance, it's used for education. There is no tribal school for children aged kindergarten to eighth grade. That is a state school. And that is one of the areas that the general fund is used for. Used for other social services, used for economic development, which Henry Carlson has been a beneficiary of throughout the state. The contractor's excise tax is a nondiscriminatory tax on the non-Indian contractor. It is not preempted expressly, nor is it preempted using the BRCA analysis, and therefore the district court's decision should be reversed. Thank you. Very well. Thank you both, counsel, for your arguments. The case is submitted. The court will file a decision in due course.